**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHEERIE J. BAKER,
<u>Plaintiff-Appellant,</u>

v.

NORTH CAROLINA DEPARTMENT OF
COMMERCE; DIVISION OF COMMUNITY
ASSISTANCE; DAVIS PHILLIPS,
Individually and in his Official
capacity of Secretary of the
Department of Commerce; ROBERT
CHANDLER, Individually and in his

No. 97-1986

Official Capacity as Director of
Community Assistance; DONNA
MOFFITT, Individually and in her
Official Capacity of Assistant Director
of the Division of Community
Assistance; STEVE CULNON,
Individually and in his Official
Capacity as Supervisor in the Division
of Community Assistance; HERB
CAMPBELL,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-95-913-5-H)

Argued: January 29, 1998

Decided: March 26, 1998

Before HAMILTON, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Conrad Alphonzo Airall, Raleigh, North Carolina, for Appellant. Ronald Moore Marquette, Special Deputy Attorney General, Charles Jerome Murray, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Michael F. Easley, North Carolina Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On October 20, 1995, Cheerie Baker filed this action in which she raised various federal and state law claims against her former employers, in their individual and official capacities, alleging, among other things, that she was unlawfully discharged because of her race and in retaliation for her exercise of free speech.[1] The district court granted summary judgment in favor of Appellees on the federal claims and dismissed the state law claims without prejudice. [2] For the reasons that follow, we affirm the district court.

_____

[1] Baker's various claims included federal claims under Title VII and 42 U.S.C.A. §§ 1981 (West 1994), 1983 (West Supp. 1997), and 1985 (West 1994); and state law claims involving the North Carolina Equal Employment Opportunities Act and both reckless and intentional infliction of emotional distress.

[2] The district court granted summary judgment in favor of all the Defendants named in Baker's complaint. On appeal, however, Baker has

2

I.

In January 1989, Cheerie Baker, a black female, began working at the North Carolina Department of Commerce (DOC) as an Emergency Shelter Grants Coordinator in the Division of Community Assistance (DCA). Nine months later she became a Community Development Block Grant (CDBG) Financial Affairs Monitor, and in November 1991, she became a CDBG Program Representative.

In January 1993, Donna Moffitt, the Assistant Director of the DCA, decided to reorganize the DCA to accommodate the implementation of a new federal program known as "HOME" and a reduction in personnel. Moffitt reassigned program development duties for both HOME and the CDBG program into a new section under the supervision of Steve Culnon. Prior to the reorganization Culnon had been running the HOME program with two employees who had no CDBG experience. On January 8, 1993, Moffitt assigned Baker, who had CDBG experience, to work under Culnon in the new section as a Program Development Analyst. At that time, Moffitt planned to hire five employees in the new division, three to work with HOME and two to work with CDBG. Unfortunately, a hiring freeze went into effect. As a result, Culnon assigned Baker, the only worker in the section with CDBG experience, to supervise the entire CDBG process and to train any new CDBG employees ultimately hired. As part of the DCA's routine procedure, Baker was also required to develop a workplan describing the duties and responsibilities of her new position.

By memorandum dated February 3, 1993, Baker refused to accept her new duties without a pay increase. By memorandum dated Febru-

_____

waived her claims against many of the original Defendants-Appellees. See Shopco Distribution Co. v. Commanding General of Marine Corps Base, 885 F.2d 167, 170 n.3 (4th Cir. 1989) (holding that any claim not raised in a party's initial brief will be deemed waived). Moreover, Defendants-Appellees Moffitt, Culnon, Chandler, and Campbell have moved to amend the caption because they no longer hold the offices within the North Carolina Department of Commerce as alleged in Baker's complaint. Because we affirm the district court's grant of summary judgment in favor of all the named Defendants-Appellees, the motion to amend the caption is moot. For ease of reading, we will refer to all the remaining Defendants-Appellees as "Appellees."

ary 12, Culnon notified Baker that there was no higher pay grade position available in the new section. He attempted to accommodate her concerns by relieving her of hiring responsibilities. Culnon also reminded Baker that she was required to prepare a workplan for her new position and provided an updated list of activities to be included. On February 15, the deadline for submission of workplans, Baker met with Dottie Fuller, the Assistant Secretary of DOC, to discuss her unhappiness and to explore other employment opportunities within the DOC. During that meeting, Baker stated her unwillingness to submit a workplan. Fuller responded that such refusal would be considered insubordination. Later that day, Baker turned in a photocopied workplan of a fellow employee to Culnon. The submitted plan was written for a lower grade level position that did not reflect Baker's new responsibilities. Moreover, the plan submitted by Baker related exclusively to the HOME program and included many inapplicable items.

The next day, February 16, Culnon informed Baker that the submitted workplan was unacceptable and requested a meeting with Baker and Moffitt to "amicably work this problem out." (J.A. at 619.) When Baker arrived at the meeting, she refused to discuss anything unless a witness was present or the meeting was taped. As a result, the meeting did not occur and Moffitt directed Culnon to begin preparing the paperwork for Baker's discharge for insubordination. Later that day, Culnon gave Baker the predismissal paperwork and told her to return the next morning. The next morning, Culnon offered to allow Baker to resign rather than be discharged. Baker chose to submit her letter of resignation, effective February 18, 1993.

In her complaint, Baker raised various federal and state law claims, alleging that she was unlawfully discharged due to her race and her exercise of free speech. Specifically, Baker asserts that in December 1992 she attended a meeting with Culnon regarding a proposal to convert a school building in Asheboro, North Carolina, into low income housing. Culnon criticized the financial viability of the project, noting that the school building was located in a poor section of town inhabited primarily by elderly black people. According to Baker, she believed that Culnon unfairly intended to deny funding of the project due to race and immediately questioned Culnon about the relevancy of race in his decision. Baker contends that shortly after this meeting

4

Culnon told Pam Wilson, another DCA employee, that he did not want Baker working for him.

As a result, Baker contends that Appellees conspired to create such difficult working conditions for her that she was forced to quit. In support of that claim, she states that despite her additional responsibilities, she was refused a pay increase. Moreover, she claims that she was assigned duties significantly beyond her experience and skill level and received no guidance from her superiors. Then, when she was unable to prepare a required workplan, she was terminated under the auspices of insubordination. The district court rejected Baker's claims, granting summary judgment in favor of Appellees on her federal claims and dismissing her state claims.

II.

On appeal, Baker argues that the district court erroneously denied her request to admit into evidence the EEOC investigator's summary of Pam Wilson's statements regarding Culnon's feelings towards Baker. She also asserts that the district court erroneously concluded that she raised no genuine issue of material fact regarding her racial discrimination and free speech claims. We will address each argument in turn.

A.

Baker asserts that the district court erroneously refused to admit a portion of the EEOC report summarizing the testimony of Wilson, Baker's co-worker, to the investigator.3  We agree with Baker that, absent a showing of untrustworthiness, factual findings resulting from an agency's lawful investigation are generally admissible in civil actions. See Fed. R. Evid. 803(8)(C). We conclude, however, that the statement in the report was immaterial to Baker's claims, and, there-

_____

3 The report at issue was actually prepared by a Department of Housing and Urban Development (HUD) investigator, not an EEOC investigator. However, the HUD report involved EEOC issues and has been referred to by the district court and both parties as the "EEOC report." Because the report's author is irrelevant to our analysis, we will also refer to it as the "EEOC report."

5

fore, any error did not affect Baker's substantial rights. See Fed. R. Evid. 103(a).

Baker contends that the report confirms that Culnon"specifically targeted [Baker] as a worker he did not want in his unit in January 1993, after [Baker] questioned his race-related comment in late December 1992" regarding the Asheboro project. (Appellant's Br. at 16.) Our review of the report, however, reveals no such animus. The report reads:

> On January 5, 1994, the Investigator interviewed on-site Pam Wilson, grade 75 at DCA. She said that in early January 1993 Mr. Culnon had expressed his concerns to her about a possible negative attitude of the Complainant and possible detriment to his staff from it.

(J.A. at 954.) Nothing in this statement even remotely suggests that Culnon harbored any racially-motivated ill-will towards Baker. Rather, it demonstrates only a general concern about Baker's dissatisfaction with her job and the possible repercussions of her unhappiness on the remainder of Culnon's staff. Because Baker has failed to provide any reason to suspect that Culnon's statements had anything to do with Baker's race, we conclude that the statement was immaterial to Baker's claims. In fact, the EEOC investigator concluded that "[t]he DCA did not discriminate against Cheerie J. Baker because of her race" in its actions surrounding her resignation. (J.A. at 957.) Accordingly, we hold that the exclusion of the report was not reversible error.

B.

Next, Baker argues that the district court's grant of summary judgment to Appellees was erroneous because she presented sufficient evidence to create genuine issues of material fact on both her racial discrimination and First Amendment retaliation claims. "We review the grant of summary judgment de novo, using the same standards as applied by the district court." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 771 (4th Cir. 1997). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

6

is no genuine issue as to any material fact." Fed. R. Civ. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In determining whether there is a genuine issue of material fact in dispute, "the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in his favor." Halperin v. Abacus Tech. Corp., 128 F.3d 191, 196 (4th Cir. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

1.

Baker claims that she was discriminated against on account of her race in violation of Title VII of the Civil Rights Act of 1964. See 42 U.S.C.A. § 2000e-2 (West 1994). Absent direct evidence of race-based discrimination, Baker must satisfy the three-part proof scheme established in McDonnell Douglas Corp. v. Green , 411 U.S. 792 (1973), to prevail on her Title VII claim.[4] First, Baker must establish, by a preponderance of the evidence, a prima facie case of race-based discrimination. Once established, the burden shifts to Appellees to "rebut the presumption of discrimination by producing evidence that [Baker] was [discharged] . . . for a legitimate, nondiscriminatory rea-

_____

[4] There is no direct evidence of racial discrimination in the record before us. Although Baker alleges the following instances of differential treatment in pay and work requirements, she presents no supporting proof for her accusations. Baker contends that when she received a promotion in October 1989, she was improperly denied a corresponding pay increase and was placed in trainee status due to the racial animosity of DCA Director, Robert Chandler. In November 1990, Baker filed a grievance regarding her salary. In January 1991, DOC Personnel Director Nelson Dollar and Chandler met with Baker and concluded that her grievance had no merit. Later, in December 1992, prior to her reassignment, Baker complained to Assistant Secretary of the DOC Dottie Fuller that she had not received salary increases due her. Fuller looked into the matter and again determined that Baker's contentions had no merit. Baker also contends that other employees failed to submit their workplans and were not terminated. Without any supporting proof, Baker's bald assertions that these instances demonstrate racial animosity by her employers do not provide direct evidence of discrimination. See Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988) (acknowledging that a plaintiff's own naked opinion, without more, is not enough to establish direct evidence of discrimination).

7

son." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). If Appellees meet their burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case," id. at 255 n.10, and Baker bears the ultimate burden of proving that she has been the victim of intentional discrimination, see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993). With this framework in mind, we address Baker's claim.

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A.§ 2000e-2(a)(1). Therefore, to establish a prima facie case of race-based discrimination under Title VII, Baker must demonstrate by a preponderance of the evidence (1) that she is a member of a protected class; (2) that she was qualified for her job and her job performance was satisfactory; (3) that, in spite of her qualifications and performance, she was discharged; and (4) that the position remained open to similarly qualified applicants after her dismissal. See Karpel v. Inova Health Sys. Servs., No. 97-1279, 1998 WL 25699, at *4 (4th Cir. Jan. 27, 1998) (citing McDonnell Douglas, 411 U.S. at 802). Although the evidence as to both the second and third element of the prima facie case is weak, we will assume for the purposes of appeal that Baker established a prima facie case of a race-based discrimination by the preponderance of the evidence.

Appellees, however, assert that Baker was discharged solely for the non-discriminatory reason of insubordination. Specifically, they point to Baker's (1) unjustified refusal to perform her duties absent a pay raise, (2) her refusal to submit a workplan, as required of all DCA employees, despite warnings that such refusal constituted insubordination, and (3) her submission of a photocopied workplan of another employee which was clearly inadequate as it detailed the activities of a position at a different pay grade and with different responsibilities than those of Baker. We agree with the district court that DCA's evidence of Baker's refusal to comply with regular work requests imposed upon all employees met its burden of demonstrating a legitimate, non-discriminatory reason for termination. As a result, Baker must show that Appellees' stated reason was pretextual.

8

In her attempt to make that showing, Baker points out that other employees often submitted co-workers' workplans and that she knew of two other employees who failed to turn in their workplans in a timely manner without repercussions. These conclusory assertions are insufficient to show pretext. See Karpel, 1998 WL 25699 at *5 (holding that delinquency of co-workers "d[id] not nullify the fact that [plaintiff]'s job performance was inadequate"). Baker also cites the EEOC report's confirmation of Culnon's race-related animosity towards her as evidence of pretext. For the reasons discussed in Part II.A, the report reveals nothing that even hints at racial animosity by Culnon towards Baker. Although Baker bears the burden of demonstrating that Appellees' proffered legitimate, non-discriminatory basis for her discharge was pretextual, she has simply failed to forecast evidence that she was the victim of intentional race discrimination. Accordingly, we affirm the grant of summary judgment in favor of Appellees on Baker's Title VII claim. See Celotex, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.")

2.

Finally, Baker contends that the district court erroneously granted Appellees summary judgment on her claim of retaliatory discharge. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); 42 U.S.C.A. § 1983 (West Supp. 1997). Baker claims that she was unlawfully discharged for exercising her right to free speech under the First Amendment of the United States Constitution. We disagree and affirm the district court.

The First Amendment protects a government employee from having her "employment conditioned upon refraining from constitutionally protected speech." Hughes v. Bedsole, 48 F.3d 1376, 1385 (4th Cir. 1995); see also Rankin v. McPherson, 483 U.S. 378, 383 (1987). To make out a § 1983 retaliation claim, however, the employee must prove that her free speech was a "substantial" or "motivating" factor in the adverse employment decision. See Mt. Healthy, 429 U.S. at 287. "If the employee meets this initial burden, the burden shifts to the public employer to show by a preponderance of the evidence that

9

the employee would still have been discharged in the absence of the protected speech." Hughes, 48 F.3d at 1385-86.

The only evidence that Baker presents in support of her claim that she was terminated for expressing her views on a matter of public concern relates to her response to the alleged comments made by Culnon at the December 1992 meeting regarding the Asheboro project. We agree with the district court that this claim fails for the simple reason that Baker has presented no evidence to suggest that the exchange with Culnon "motivated" DCA's decision to terminate her. To the contrary, Culnon tried to help Baker by providing to her the list of activities she needed to include in the workplan. Moreover, in the face of Baker's blatant noncompliance, Culnon attempted to amicably resolve the conflict by setting up a meeting with his supervisor, Moffitt. The evidence shows that Moffitt and her supervisor Fuller, not Culnon, decided that Baker should be terminated for insubordination, not for her disagreement with Culnon over the Asheboro project. In short, Baker's claim must fail because she has not presented any evidence to suggest that her remarks to Culnon led to her discharge. Accordingly, we affirm the grant of summary judgment to Appellees on Baker's § 1983 First Amendment retaliation claim. See Celotex, 477 U.S. at 322.

AFFIRMED

10